Aras v B-U Realty Corp. (2023 NY Slip Op 04917)

Aras v B-U Realty Corp.

2023 NY Slip Op 04917

Decided on October 03, 2023

Appellate Division, First Department

 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: October 03, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Cynthia S. Kern
Ellen Gesmer Tanya R. Kennedy Saliann Scarpulla Julio Rodriguez III

Index No. 161448/14 Appeal No. 16846 Case No. 2022-01126 

[*1]Leisa Aras, et al., Plaintiffs-Appellants-Respondents, Catherine Schwartz, et al., Plaintiffs,
v
B-U Realty Corp., et al., Defendants-Respondents-Appellants.

Cross-appeals from an order of the Supreme Court, New York County (James D' Auguste, J.) entered on or about September 9, 2021, which, to the extent appealed from as limited by the briefs, granted the motion of plaintiffs Leisa Aras, Robert Arnot, Sarah Barish-Straus, James Gladstone, Kathleen Campana, Patricia Lederer, Albert Panozzo, Georgia Marantos, John Menapace, Karen Menapace, Peter Kane, and Paulina Perera-Riveroll for summary judgment on liability on the cause of action in the amended complaint for rent overcharges (the first cause of action) only with respect to plaintiffs Aras, Panozzo, Marantos, Kane, Perera-Riveroll, John Menapace, Karen Menapace, Barish-Straus, and Lederer, held the motion in abeyance with respect to plaintiffs Gladstone and Campana, and denied the motion with respect to plaintiff Arnot.

Ephron-Mandel & Howard, L.L.P., New York (Damon P. Howard of counsel), for appellants-respondents.
Sidrane, Schwarz-Sidrane, Perinbasekar & Littman, LLP, Rockville Centre (Michael Littman of counsel), for respondents-appellants.

Kennedy, J. 

The issues presented on this appeal are (1) what is the appropriate base date rent for calculating damages and (2) whether the record before us sets forth evidence of a fraudulent scheme to deregulate the subject apartments to permit use of the default formula pursuant to Rent Stabilization Code (RSC) (9 NYCRR) § 2526.1(g).
As relevant herein, plaintiffs are current and former tenants of the residential apartment building located at 945 West End Avenue in Manhattan as follows: Leisa Aras (apartment 11B); Robert Arnot (formerly apartment 11C); Sarah Barish-Straus (apartments 2C and 9D); James Gladstone and Kathleen Campana (formerly apartment 10B); Patricia Lederer (apartment 8D); Albert Panozzo and Georgia Marantos (apartment 1B); John Menapace and Karen Menapace (apartment 8A); and Peter Kane and Paulina Perera-Riveroll (apartment 10D). Defendant B-U Realty Corp. is the building's owner, and defendant Paul Bogoni is B-U's managing member and agent.
By summons and complaint dated November 18, 2014, plaintiffs commenced this action, and by amended complaint dated November 15, 2016, plaintiffs Arnot, Barish-Straus, and Lederer joined the action, asserting claims for, inter alia, rent overcharges. Defendants denied the material allegations in the amended complaint and asserted affirmative defenses, including offset and accord and satisfaction. The note of issue was filed in September 2020, certifying that discovery was complete.
Plaintiffs moved for partial summary judgment, arguing that the evidence established a building-wide fraudulent scheme, requiring application of the default formula in calculating damages. Specifically, plaintiffs argue that the following facts demonstrate fraud: (1) Bogoni testified at a deposition in Pascaud v B-U Realty (2017 NY Slip Op 31482[U] at *4 [Sup Ct, NY County 2017]) that he heard about Roberts v Tishman Speyer Props, L.P. (13 NY3d 270 [2009]) by [*2]2011;[FN1]
(2) in Kreisler v B-U Realty Corp. (164 AD3d 1117 [1st Dept 2018], lv dismissed 32 NY3d 1090 [2018]), this Court found thatthese same defendants engaged in a building-wide fraudulent scheme to deregulate the building; (3) on or about July 14, 2014, Assemblymember Daniel O'Donnell wrote to the Bureau Chief of the Tenant Protection Unit of the New York State Division of Housing and Community Renewal (DHCR) concerning defendants deregulating apartments while in receipt of J51 benefits;[FN2] (4) on or about August 14, 2014, DHCR directed the landlord to register eight apartments (including 8A, 9D, and 10D); and (5) after receiving that letter, defendants filed amended registrations in 2015 and in some instances 2017.
Although defendants conceded certain overcharges in opposition, they maintained that damages should be calculated under Rent Stabilization Law (RSL)(Administrative Code of City of NY) § 26-516 and RSC 2526.1(a)(3)(i), rather than the default formula because the overcharges resulted from error and not fraud.
The motion court granted summary judgment as to plaintiffs Aras (apartment 11B), Panozzo & Marantos (apartment 1B), Kane & Perera-Riveroll (apartment 10D), the Menapaces (apartment 8A), Barish-Straus (apartment 9D) and Lederer (apartment 8D), and found that fraud was established, determining that the default formula would be used to calculate damages. The court denied the motion as to Arnot and his wife, Ellen Hirsch (apartment 11C) and Barish-Straus (apartment 2C) and held the claims in abeyance as to Gladstone and Campana (apartment 10B). For the reasons that follow, we conclude that the record before us did not establish evidence of a fraudulent scheme to deregulate the subject apartments as a matter of law, and that it was improper to utilize the default formula to calculate damages, and further modify the order as set forth herein.
As a threshold matter, the base date for all plaintiffs is November 18, 2010, four years before the filing of the original complaint on November 18, 2014. Prior to the enactment of the Housing Stability and Tenant Protection Act of 2019 (HSTPA) (L 2019 ch 36), CPLR 213-a and RSL 26-516(a)(2) provided for a strict "lookback" period, permitting recovery of rent overcharges four years prior to the filing of a tenant's complaint. Defendants here, however, were on notice of plaintiffs' claims before this action was commenced — specifically, since at least August 14, 2014, when the Tenant Protection Unit of DHCR informed them that every apartment in the building was subject to rent stabilization by virtue of defendants' receipt of J51 benefits from 2005 through 2019. Thus, plaintiffs Arnot, Barish-Straus, and Lederer, who joined the action in the amended complaint, are entitled to application of the relation-back doctrine (CPLR 203[f]; see Matter of Century Tower Assoc. v State of N.Y. Div. of Hous. & Community Renewal, 83 NY2d 819, 822 [1994]; cf. Thornton v Baron, 5 NY3d 175, 180 n2 [2005] [rejecting [*3]relation-back doctrine as applied to new defendant where "defendants were not united in interest within the meaning of CPLR 203(b)"]).
The history of the complex statutory and factual framework surrounding rent overcharge claims in buildings deregulated while receiving J51 benefits has led to the development of precedent upon which our decision now rests. Most notably, the Court of Appeals' decisions in Roberts v Tishman Speyer Props., L.P. (13 NY3d at 280), Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal (35 NY3d 332 [2020]) and Casey v Whitehouse Estates, Inc. (39 NY3d 1104 [2023]) provide an evolving roadmap to resolve these cases.
In 2009, the Roberts Courtclarified that contrary to an opinion which DHCR issued, luxury decontrol of apartment units was unavailable in any building receiving J51 benefits (13 NY3d at 285—287). In 2011, this Court held that Roberts applied retroactively (Gersten v 56 7th Ave. LLC, 88 AD3d 189 [1st Dept 2011], appeal withdrawn 18 NY3d 954 [2012]).
The rent overcharge claims before us are governed by the former provisions of the RSL and the RSC, the latter of which are regulations that DHCR sets and administers.[FN3]
These rent overcharges are to be calculated based upon the "legal regulated rent" (RSL 26-516), which "shall be deemed to be the rent charged on the base date, plus in each case any subsequent lawful increases and adjustments" (RSC 2526.1 [a][3][i]; see also 2520.6 [e]).
Under the RSL and RSC, overcharge claims were subject to a four-year statute of limitations and "examination of the rental history of the housing accommodation prior to the four-year period preceding" was precluded (RSL 26—516[a][2]; see also former CPLR 213—a, as amended by L 1997, ch 116). Section 2526.1(a)(2) of the RSC, set forth a "fraud exception" which provided, in pertinent part:
(iv) in a proceeding pursuant to this section the rental history of the housing accommodation pre-dating the base date may be examinedfor the limited purpose of determining whether a fraudulent scheme to destabilize the housing accommodation . . . rendered unreliable the rent on the base date (emphasis added).
A tenant's overcharge complaint, if proven, requires landlords to pay treble damages "equal to three times the amount of [an] overcharge" or "[i]f the owner establishes by a preponderance of the evidence that the overcharge was not willful" then the amount of the overcharge plus interest (RSL 26-516; RSC 2526.1[a][1]).
Finally, RSC 2526.1(g) permits use of the default formula to establish the "legal regulated rent," only when, in pertinent part, "[(1)] the rent charged on the base date cannot be determined, [(2)] a full rental history from the base date is not provided, or [(3)] the base date rent is the product of a fraudulent scheme to deregulate the apartment" (see also RSC 2522.6[b]).
In Regina (35 NY3d 332), the Court of Appeals affirmed the foregoing statutory framework and held that: (1) [*4]a tenant's overcharge claim is limited to the amount actually charged on the base date, four years prior to the filing of the complaint, plus any permitted increases; (2) review of the rental history outside of the lookback period is limited only to determine whether a fraud to deregulatethe apartment occurred; and (3) if a fraudulent scheme to deregulateis established, only then may the rent charged be deemed unreliable to permit use of the default formula. Thus, Roberts cases (where deregulation occurred during receipt of J51 benefits), generally do not support fraud because deregulation is usually based upon a misunderstanding of the law at that time. Moreover, regardless of fraud, the Court of Appeals expressly rejected the notion that the base date rent can be reconstructed (Regina, 35 NY3d at 358).
The issue was again reviewed and reaffirmed by the Court of Appeals in Casey v Whitehouse Estates, Inc. (39 NY3d at 1106). There, the landlord's amended registration statements, which improperly reported the rent paid, were filed after the commencement of that action. This Court found that such was an indicia of defendant's fraud to alter the rental history and leave that apartment outside the rent stabilization framework, and applied the default formula (197 AD3d 401 [1st Dept 2021]). The Court of Appeals reversed, concluding that the foregoing was not evidence of fraud to deregulate and thatdefendants' subsequent re-registration of the apartment in 2011 was of no moment. The amendments were registered after the four-year lookback period, and plaintiffs failed to offer evidence that the inaccurate amended registrations "somehow affected the reliability of the actual rent plaintiffs paid on the base date" (Casey, 39 NY3d at 1107; see also Matter of Trainer v State of N.Y. Div. of Hous. & Community Renewal, 162 AD3d 461, 463 [1st Dept 2018] ["Although petitioner correctly notes that there was a significant increase in rent from 2003 to 2004, that increase and a few discrepancies in the registration statement do not suffice as indicia of fraud to require DHCR to inquire beyond the four-year statute of limitations"]; Gridley v Turnbury Vil., LLC, 196 AD3d 95, 103 [2d Dept 2021] lv denied __NY3d__, 2021 NY Slip Op 75990 [2021]). The Casey Court also clarified that "[f]or purposes of calculating overcharges, where it is possible to determine the rent 'actually charged on the base date' . . . that amount should be used and rent increases legally available to defendants pursuant to the [RSL] during the four-year period should be added" (39 NY3d at 1107).
Court of Appeals precedent consistently instructs us to strictly enforce the four-year lookback period which, like any statute of limitations, serves to cut off claims (Regina, 35 NY3d at 360 ["Civil liability is always bounded by the public policy of repose embodied in statutes of limitations. Overcharge liability under the RSL is no different. That Roberts revealed particular conduct to [*5]be illegal does not mean that tenants must be able to recover a certain measure of monetary damages for associated rent increases despite their failure to seek recovery within the limitations and lookback periods"][internal citations omitted]).
Speculation of fraud will not suffice to expand the lookback period or invoke the default formula. All elements of fraud must be established. Even in the absence of fraud, tenants whose units were improperly deregulated while in receipt of J51 benefits have recourse. To the extent plaintiffs complain that their initial rents were inaccurate and tainted by defendants' failure to comply with the RSC and RSL, there are alternative statutory methods by which to remedy these inaccuracies (see RSC 2528.4; see also e.g. Grady v Hessert Realty L.P., 178 AD3d 401 [1st Dept 2019]).
It is with this backdrop that we review the record before us. The burden, as with any summary judgment motion, is on the movants (here, plaintiffs) to "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact. Failure to make such [a] showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986][internal citation omitted]).
The statutory scheme requires that the legal regulated rent be calculated pursuant to the standard method set forth under RSC 2526.1(a)(3)(i) and RSL 26-516. Plaintiffs had the burden to prove fraud, requiring application of the default formula as the exception to this rule. To support their demand for summary judgment, plaintiffs were required to prove, prima facie, the elements of fraud (see Hess v EDR Assets LLC, 217 AD3d 542 [1st Dept 2023]; Woodson v Convent 1 LLC, 216 AD3d 585, 588 [1st Dept 2023]; Gridley v Turnbury Vil. LLC, 196 AD3d at 101. However, they neither pled the necessary elements nor, to the extent pled, adequately proved them.
Plaintiffs' reliance upon Bogoni's testimony in Pascaud is unavailing. First, the Pascaud court's finding is of no moment in light of subsequent case authority from the Court of Appeals. In addition, the plaintiffs in Pascaud challenged the validity of improvements that defendants made to justify destabilization, which is not present here. Plaintiffs' sole argument here is that defendants' post-Roberts destabilization is sufficient as a matter of law to use the default formula because Bogoni was aware of this decision.
Similarly unavailing is this Court's prior finding in Kreisler that these same defendants engaged in a building-wide fraud to deregulate and permitted review of the rental history beyond the lookback period. The law is now settled that a building-wide scheme is insufficient to support fraud on a case-by-case basis (Casey, 39 NY3d at 1107 [remanding and directing that "assessment[s] must be made for each apartment"]). Moreover, it is also important to note [*6]that Kreisler involved a different set of plaintiffs, with unique facts concerning those tenancies. Also of no moment is the July 2014 letter from Assemblymember O'Donnell to DHCR concerning defendants deregulating apartments while in receipt of J51 benefits since this letter was not forwarded to defendants.
With respect to the plaintiffs herein, there is no dispute that plaintiffs Aras (apartment 11B), Lederer (apartment 8D), Barish-Straus (only as to apartment 9D), the Menapaces (apartment 8A) and Kane and Perera-Riveroll (apartment 10D) were overcharged during the four-year lookback period preceding the complaint. Accordingly, summary judgment on the issue of liability was properly granted as to these plaintiffs. For the reasons set forth below, however, plaintiffs have not established defendants' fraud to deregulate the subject apartments, which would entitle them to review the rental history beyond the lookback period and damages pursuant to the default formula set forth in RSC 2526.1 and 2522.6(b) (see Woodson v Convent 1 LLC, 216 AD3d 588).
Apartments 11B (Aras) and 8D (Lederer) were deregulated prior to the Court of Appeals' decision in Roberts, in 1997 and 2004, respectively. Aras and Lederer do not present any evidence that these "pre-Roberts" deregulations were premised on anything other than a misunderstanding of the law at that time. Moreover, these plaintiffs have not provided any evidence demonstrating that defendants' inaccurate amended registrations, filed after the commencement of this action and after the lookback period, "somehow affected the reliability of the actual rent [, the 'legal regulated rent',] plaintiffs paid on the base date" (Casey, 39 NY3d at 1107). The amended registration for apartment 11B lists the legal regulated rent, including Aras's rent, which generally comports with allowable increases and the rent that Aras actually paid. Aras, who is a real estate agent, does not contest the rents or increases listed on the registration from 2006 through 2017. Lederer similarly fails to challenge or even address defendants' calculations as it relates to legal rents and increases for apartment 8D. Accordingly, while the deregulations were improper, Aras and Lederer did not establish that they were fraudulent as a matter of law or even prima facie that the base date rent as to them was the product of a fraudulent scheme, such that the default formula applies (Regina, supra).
With respect to Gladstone and Campana, apartment 10B was deregulated in 1998, pre-Roberts,and plaintiffs do not contend that the deregulation was fraudulent. Moreover, defendants were entitled to charge a market rent when plaintiffs entered into their initial lease for 10B since the building was not in receipt of J51 benefits at that time and there is no evidence that the initial base date rent was impermissible. Thus, these plaintiffs have not established that they were overcharged on their initial lease. However, the motion court [*7]properly held the motion in abeyance pending further submissions as to the appropriate rent increases with respect to apartment 10B to determine whether there was an overcharge in connection with the renewal leases.
As to apartments 11C and 1B, the landlord was permitted to set a market rent at the start of Arnot and Hirsch's and Panozzo and Maranto's initial leases (RSC 2522.3). These plaintiffs' only remedy was to file a Fair Market Rent Appeal with DHCR within four years of the commencement of their lease terms, which they did not do. Plaintiffs fail to establish that defendants acted fraudulently in setting the initial rent or when registering these units as rent-stabilized after the previous rent-controlled tenant vacated. Plaintiffs also failed to present any evidence of a prior tenancy. Contrary to these plaintiffs' arguments, the failure to include these apartments on the building's maximum base rent schedule does not, alone, establish fraud to deregulate or that another tenant subsequently occupied the apartments after the rent-controlled tenant. Accordingly, summary judgment as to these plaintiffs should have been denied.
Moreover, as to apartment 1B, the motion court erred in employing the default formula by determining that defendants' failure to rent stabilize 1B in 2005, when the building enrolled in the J51 program, made "it impossible to determine whether Panozzo's initial rent had been accurately calculated by adding six years' worth of 'subsequent lawful increases and adjustments' to the unit's initial rent stabilized rent." Such is not the standard and the reconstruction method has been rejected by Regina (35 NY3d at 358).
As to apartment 2C, the motion court was correct to deny Barish-Straus's motion since she did not submit a lease evidencing her tenancy. Regardless, even if there is no dispute as to whether Barish-Straus resided in apartment 2C between 2008 and 2012, Barish-Straus failed to offer any evidence that the pre-Roberts deregulation of 2C in 1998 was fraudulent.
With respect to plaintiffs Barish-Straus (apartment 9D), the Menapaces (apartment 8A), Kane and Perera-Riveroll (apartment 10D), their apartments were all deregulated after Roberts in 2012, 2013 and 2010, respectively. The motion court's finding of fraud regarding these apartments relied upon Montera v KMR Amsterdam LLC (193 AD3d 102 [1st Dept 2021]), which was misplaced. There, we denied defendant's pre-discovery summary judgment motion because the post-Roberts deregulation and the late filing of amended registrations supported an indicia of fraud to deregulate, such that discovery of the rental history outside the four-year lookback period was appropriate (id. at 103, 109). We did not hold that these facts were sufficient to establish fraud as a matter of law.
The DHCR registration for apartment 9D indicates that it was deregulated in 2012 due to a high-rent vacancy and was listed as exempt in 2013. The record shows that Barish-Straus's [*8]initial base date rent was within the appropriate increases permitted by the rent guidelines and there is no evidence demonstrating that this rent was unreliable. While there is an inconsistency in the amended registrations, which were filed after commencement of this action, between the rent Barish-Straus paid in 2013 ($3,570) and the rent listed ($3,500), Barish-Straus does not dispute the validity of her base date rent or contest the increase calculations defendants presented.
With respect to apartment 8A, the Menapaces were notified that their unit would be deregulated in 2013. However, the fact the amended registrations dating from 2006 listed a different legal regulated rent than from what they actually paid is of no moment (Regina, 35 NY2d at 360 [the "use of a potentially inflated base date rent, flowing from an overcharge predating the limitations and lookback period was proper in the absence of fraud"]). On this record, these plaintiffs have not presented sufficient evidence of fraud as a matter of law to render the base date unreliable.
Finally, plaintiffs Kane and Riveroll commenced occupancy of apartment 10D in November 2009, one month after Roberts was decided. The unit was deregulated in 2010. While Roberts was decided prior to deregulation, the retroactive implications were not addressed by this Court until 2011 and adopted by the Court of Appeals in Regina (35 NY2d at 350).In a time riddled with questions concerning this topic, it cannot be held that a post-Roberts deregulation establishes fraud.
To reiterate, the filing of late or incorrect registrations does not support fraud as a matter of law (Casey, 39 NY3d at 1107; see also Gridley, 196 AD3d at 101). Similarly, the fact that there are inconsistencies between the rent on the base date and what was filed on the amended DHCR registrations is not enough to establish fraud, nor does the "remaining" evidence cited by plaintiffs establish fraud as a matter of law.
Our dissenting colleagues present arguments that are speculative, raise red herrings, and go beyond the issues presented herein. In fact, the dissent addresses issues that the parties did not even raise in their briefs. This decision is solely limited to our review of the record before us and the arguments presented, i.e., whether plaintiffs established fraud as a matter of law upon the evidence presented to the trial court.
Accordingly, the order of the Supreme Court, New York County (James D' Auguste, J.), entered on or about September 9, 2021, which, to the extent appealed from as limited by the briefs, granted the motion of plaintiffs Leisa Aras, Robert Arnot, Sarah Barish-Straus, James Gladstone, Kathleen Campana, Patricia Lederer, Albert Panozzo, Georgia Marantos, John Menapace, Karen Menapace, Peter Kane, and Paulina Perera-Riveroll for summary judgment on liability on the cause of action in the amended complaint for rent overcharges (the first cause of action) only with respect to plaintiffs Aras[*9], Panozzo, Marantos, Kane, Perera-Riveroll, John Menapace, Karen Menapace, Barish-Straus, and Lederer, held the motion in abeyance with respect to plaintiffs Gladstone and Campana, and denied the motion with respect to plaintiff Arnot should be modified, on the law, to clarify that the base date for all plaintiffs is November 18, 2010, to deny the motion as set forth herein as to plaintiffs Gladstone and Campana and Panozzo and Marantos, and to remand the matter for a determination on damages, to be calculated pursuant to RSL 26-516 and 9 NYCRR 2526.1(a)(3)(i), and otherwise affirmed, without costs.
All concur except Gesmer and Rodriguez, JJ.
who dissent in an Opinion by Gesmer, J.

Gesmer, J. (dissenting)
 

I disagree with the majority in several major respects. First, in the motion before us, only plaintiff-tenants moved for summary judgment. However, the majority would rule, as a matter of law, that any damages due to the tenants must be calculated pursuant to Rent Stabilization Law (RSL) (Administrative Code of City of NY) § 26-516 and Rent Stabilization Code (RSC) (9 NYCRR) § 2526.1(a)(3)(i), not the default formula. In so holding, the majority would in effect grant summary judgment to defendants on the issue of how the tenants' damages should be calculated, even though defendants did not request that relief. This is clearly improper.
Second, I disagree with the majority that this Court may determine on this record, as a matter of law, that the landlord did not engage in a fraudulent scheme which denied the tenants the benefits of the RSL.[FN1] I further disagree that plaintiffs have not shown sufficient indicia of fraud to permit review of their rent history preceding the base date for each apartment (Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 NY3d 332, 355 [2020]). Rather, I would hold that there are questions of fact as to whether the landlord engaged in a fraudulent scheme to deregulate the apartments or to overcharge the tenant that caused the reliability of the base date rents to be tainted. If the court so finds, the Supreme Court may in turn be required to apply the RSC's default formula (id. at 358-359; 9 NYCRR 2522.6[b][3][i]).[FN2] Accordingly, I would deny summary judgment and remand for the trial court to resolve those issues at trial (see Hess v EDR Assets, 217 AD3d 542 [1st Dept 2023]).
I
The parties here appeal and cross-appeal from Supreme Court's order deciding plaintiffs' motion for summary judgment. Accordingly, since defendants have not asked this Court to search the record and grant judgment in their favor as to any issue, the only question presented is whether the record establishes plaintiffs' entitlement to judgment as a matter of law. As a matter of procedure, the majority's conclusion that plaintiffs failed to demonstrate a fraudulent scheme to deregulate their apartments is proper and I agree with it. However, the majority acted improperly in barring the use of the default [*10]formula to calculate the tenants' damages.
"If a summary judgment motion is made and denied, the action survives for its trial before a judge, referee, or jury" (Hon. Mark C. Dillon, Prac Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3212:1). Here, plaintiffs, as the only movants in the motion court, attempted to establish their entitlement to judgment as a matter of law. To do so, they submitted evidence to show that defendants engaged in a fraudulent scheme to deregulate the apartments, which, if successful, would warrant application of the default formula. Of course, plaintiffs had the burden of establishing their theory of recovery by admissible evidence and as a matter of law, and the majority concludes that they did not meet this burden.
Although I agree with this conclusion, I disagree with the majority's decision as to its consequence for plaintiffs' claims. In directing that damages "be calculated pursuant to RSL 26-516 and RSC 2526.1(a)(3)(i)," and holding that it is "improper to utilize the default formula to calculate damages," the majority improperly precludes plaintiffs from making a factual showing at trial that would demonstrate their entitlement to application of the default formula. The majority's decision thus improperly and without justification penalizes plaintiffs as the only parties who requested affirmative relief below and grants relief to defendant which they did not seek.
II
The Court of Appeals has held that deregulation of rent stabilized units is not permitted during any period when the landlord is receiving J-51 benefits. It has further held that a landlord's violation of this rule prior to the Court of Appeals' 2009 ruling in Roberts v Tishman Speyer Props., L.P. (13 NY3d 270 [2009]) did not constitute fraud where the landlord was acting in reliance on erroneous DHCR guidance (id.; Regina, 35 NY3d at 356). The Court of Appeals has also noted that a landlord's deregulation of rent stabilized units while it was receiving J-51 benefits does not insulate it from a holding that it was engaged in a fraudulent scheme to deregulate (Regina, 35 NY3d at 361).
Here, I would find for three reasons that there are questions of fact that require a trial as to whether defendants engaged in a fraudulent scheme to overcharge or deregulate plaintiffs-appellants' apartments which would require application of the default formula. First, some of their apartments were deregulated long after 2009 and after defendant Bogoni admitted he knew of his obligation to treat all apartments as rent-stabilized during receipt of J-51 benefits. Accordingly, these are not classic Roberts cases at all. Second, even in the case of apartments that had been deregulated before 2009, there are indicia of fraud present that distinguish the cases of these tenants from the facts of Roberts and the Court of Appeals cases that followed it. Third, I would find that the majority misreads Regina as to the legal criteria that a court must consider [*11]in order to determine whether there was fraud. In this section, I review the relevant case law and, in the final section, discuss the application of those rulings to the individual plaintiffs-appellants' apartments.
A
In 2009, the Court of Appeals in Roberts v Tishman Speyer Properties, L.P. affirmed this Court's ruling that "all apartments in buildings receiving J—51 tax benefits are subject to the RSL during the entire period in which the owner receives such benefits" (Roberts, 62 AD3d 71, 81 [1st Dept 2009], affd 13 NY3d 270). The Court of Appeals held that landlords receiving tax benefits under New York City's "J-51" program forfeited their rights under the "luxury decontrol" provisions of the RSL in effect at the time. The Court ruled that was true whether those units were already subject to rent stabilization prior to receipt of J-51 benefits or became rent-stabilized solely because the landlord received J-51 benefits (13 NY3d at 283-284). In August 2011, this Court held in Gersten v 56 7th Avenue LLC that the holding in Roberts applied retroactively (88 AD3d 189, 198 [1st Dept 2011], appeal withdrawn 18 NY3d 954 [2012]).
Prior to Roberts, the Division of Housing and Community Renewal (DHCR) had advised landlords receiving J-51 benefits that they were permitted to remove an apartment from the protection of the RSL under certain circumstances.
In April 2020, the Court of Appeals in Regina (35 NY3d 332) addressed a core issue in the appeal now before this Court: "the proper method for calculating the recoverable rent overcharge for New York City apartments that were improperly removed from rent stabilization during receipt of J-51 benefits prior to our 2009 decision in Roberts" (id. at 348).
The Court held that cases in which the alleged overcharges occurred prior to the enactment of the Housing Stability and Tenant Protection Act of 2019 (L 2019, ch 36, §1, part F [HSTPA]) had to be decided by the law in effect before HSTPA's effective date in 2019. Accordingly, it stated, "under pre-HSTPA law, the four-year lookback rule and standard method of calculating legal regulated rent govern in Roberts overcharge cases, absent fraud" (35 NY3d at 361).[FN3] The Court reiterated its approval of the use of the RSC's "default formula where fraud is established" (Regina, 35 NY3d at 358-359). Under the RSC, that formula is applicable in cases where "the rent charged on the base date cannot be determined" or "the base date rent is the product of a fraudulent scheme" (9 NYCRR 2522.6[b][2][i] and [iii]). In lieu of using the base date, the default formula uses "the lowest rent charged for a rent-stabilized apartment with the same number of rooms in the same building on the relevant base date" (Regina, 35 NY3d at 354-355 [internal quotation marks omitted]). The Regina Court pointed out that, in many J-51 overcharge cases, "the owners removed apartments from stabilization consistent with [DHCR] guidance" (id. at 356). As a result, the Court concluded that, [*12]"[b]ecause conduct cannot be fraudulent without being willful, it follows that the fraud exception to the lookback rule is generally inapplicable to Roberts overcharge claims" (id.).
However, both Regina and Casey v Whitehouse Estates, Inc. (39 NY3d 1104 [2023]), the case that followed it and reiterated its central holding, reaffirmed the holdings of earlier cases that:
(1) where the tenant presents evidence constituting sufficient indicia that the landlord engaged in a fraudulent scheme to deregulate and/or overcharge tenants, the court may review rental history outside the four-year lookback period to establish fraud (Regina, 35 NY3d at 355; Casey, 39 NY3d at 1106 [both citing Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal, Off. of Rent Admin., 15 NY3d 358 [2010]]; see also Montera v KMR Amsterdam LLC, 193 AD3d 102, 109 [1st Dept 2021]; 435 Cent. Park W. Tenant Assn. v Park Front Apts., LLC, 183 AD3d 509, 510-511 [1st Dept 2020] [both reiterating the same principle]); and
(2) where the evidence establishes fraud, the default formula may be applied to establish the legal rent and determine the amount of overcharge damages (Regina, 35 NY3d at 354-356, citing Conason v Megan Holding, LLC, 25 NY3d 1 [2015]; Thornton v Baron, 5 NY3d 175 [2005]; Grimm, 15 NY3d 358; see also Casey, 39 NY3d at 1106, citing Regina, 35 NY3d 332).
Accordingly, those rules remain good law. It is certainly likely that many landlords who deregulated rent stabilized apartments under luxury decontrol prior to Roberts and Gersten while receiving J-51 benefits were relying in good faith on what turned out to be incorrect guidance from DHCR and were not engaged in fraudulent schemes. However, the fact that DHCR was giving misleading advice does not preclude the possibility that some landlords who decontrolled apartments while receiving J-51 benefits were engaged in fraudulent schemes.
Put another way, neither Regina nor Casey holds that a court is barred from reviewing the pre-base date rent history to determine whether there was fraud, and, in doing so, examining whether the registered rents comport with applicable guidelines increases for earlier years. In Thornton, cited with approval in Regina, the Court noted that, were it to apply the base date rent where the landlord had engaged in a fraudulent scheme to overcharge and ultimately deregulate apartments, "a landlord whose fraud remains undetected for four years—however willful or egregious the violation—would, simply by virtue of having filed a registration statement, transform an illegal rent into a lawful assessment that would form the basis for all future rent increases" (5 NY3d at 181). In Grimm, cited with approval in both Regina and Casey, the Court of Appeals held that, where a tenant alleges fraud in an overcharge claim, the court or DHCR, as the authority determining the claim, "has an obligation to ascertain whether the rent on the base date is a lawful rent" (15 NY3d at 366 [emphasis [*13]added]). The Grimm Court clarified that:
"Generally, an increase in the rent alone will not be sufficient to establish a 'colorable claim of fraud,' and a mere allegation of fraud alone, without more, will not be sufficient to require DHCR [or a court] to inquire further. What is required is evidence of a landlord's fraudulent deregulation scheme to remove an apartment from the protections of rent stabilization" (id. at 367).
Therefore, when, as here, a tenant has presented evidence establishing a colorable claim of fraud, the court has an obligation to examine the rent charged on the base date. Indeed, in Regina, the Court confirmed that its holding in Grimm remains the law when it stated that "use of a potentially inflated base date rent, flowing from an overcharge predating the limitations and lookback period, was proper in the absence of fraud" (Regina, 35 NY3d at 360 [emphasis added]). Thus, these precedents establish that, if a tenant is successful in demonstrating fraud resulting in an unknowable, inflated or otherwise unreliable base date rent, the appropriate remedy is to apply the default formula rather than to use the improper base date rent. Furthermore, and as discussed below, since the Court of Appeals has approved of the default formula's application in cases where the base date rent was known and undisputed, a showing of fraud is sufficient to render a base date rent amount at least presumptively unreliable.
In my view, the majority is interpreting Regina and Casey so as to preclude any finding that a landlord has committed fraud tainting the reliability of the base date rent so long as the landlord's allegedly fraudulent acts took place during a period when the landlord was receiving J-51 benefits, even if the landlord's failure to treat an apartment as rent-stabilized was not a result of the landlord's reliance on guidance issued by the DHCR prior to and inconsistent with Roberts and Gersten.
In Regina, the Court of Appeals drew a sharp distinction between the circumstance of the landlords in the cases before it who had deregulated apartments in reliance on DHCR guidance on J-51 benefits and whose tenants had not come forward with evidence of fraud, from earlier cases in which the Court had found fraud (Conason, 25 NY3d 1 [default formula applied where landlord was found after trial to have registered a fictitious prior tenant in order to unlawfully inflate plaintiffs' "legal" rent]; Grimm, 15 NY3d 358 [vacating DHCR's denial of overcharge petition and remanding to consider fraud allegations and the reliability of the base date rent where the landlord had significantly increased the rent, offered leases without a rent stabilization rider, required tenants to make improvements at their own expense or pay increased rent, and failed to register the apartment for several years until after service of the complaint]; Thornton, 5 NY3d at 180 [landlord's creation of illusory tenancies to raise rents above luxury decontrol thresholds [*14]and lack of "reliable rent records" required application of the default formula to overcharge claim]). Indeed, Judge Kaye pointed out in Thornton that to do otherwise would "reward[] the owner's wrongdoing." By drawing the distinction between deregulation done in good faith and that based on a fraudulent scheme, Regina was careful not to overrule those cases, or even limit them, and thus affirmed the principles decided by them. As this Court held in Montera,
"Regina does not grant an owner carte blanche in post-Roberts/Gersten cases to willfully disregard the law, by failing to re-register illegally deregulated apartments, enjoying tax benefits while continuing to misrepresent the regulatory status of the apartments, and taking steps to comply with the law only after its scheme is uncovered. Owners should not be incentivized to remove regulated housing from the statutory scheme by simply ignoring the law." (193 AD3d at 107).
The facts of Casey, as discussed in detail in the trial court and Appellate Division opinions, place it in line with the classic Roberts scenario. In Casey, the landlord, consistent with then DHCR guidance, had deregulated 78 rent-stabilized apartments while receiving J-51 benefits. Approximately one month after this Court issued its opinion in Gersten establishing that Roberts applies retroactively, and before the tenants in Casey commenced their overcharge action, the landlord sent a letter to the tenants acknowledging that their apartments had been deregulated in error and that the rent registrations for their apartments would be amended and any overcharges reimbursed. The landlord also notified tenants that if the rent they paid was lower than the registered rent, they would be permitted to continue to pay the lower sum as a "preferential rent." The tenants then commenced an overcharge action in October 2011. In early 2012, consistent with its earlier notices to the tenants, the landlord filed retroactive registrations listing the formerly deregulated apartments as rent-stabilized (Casey v Whitehouse Estates, Inc., 197 AD3d 401, 402 [1st Dept 2021], revd 39 NY3d 1104 [2023]; see also 197 AD3d at 406-408 [Gische, J., dissenting]).
The deregulation at issue in Casey "was based on the same 'misinterpretation of law' involved in Regina" (Casey, 39 NY3d at 1107, quoting Regina, 35 NY3d at 356), that is, a pre-Roberts deregulation "consistent with agency guidance" (Regina, 35 NY3d at 356). Since the claim of fraudulent deregulation in Casey was based, at its core, on good faith Roberts deregulation alone, the Court of Appeals held that the defendants' "conduct did not constitute fraud" (Casey, 39 NY3d at 1107). The Casey Court's statement regarding the method of calculating overcharges, which is relied on by the majority, as discussed below, must therefore be read as deciding the appeal before it on its own facts, which concerned only non-fraud Roberts claims (id.). Indeed, the brief Casey memorandum acknowledged that "[i[*15]]n fraud cases, because the reliability of the base date rent has been tainted, 'this Court sanctioned use of the default formula to set the base date rent'" (39 NY3d at 1106, quoting Regina, 35 NY3d at 355).
In an area of the law scarred by misinterpretation (see Roberts, 13 NY3d 270), the holding in Casey should not be distorted beyond its facts. Casey's brief memorandum decision explicitly applies only to deregulations "based on th[e] same [non-fraudulent] 'misinterpretation of the law' involved in Regina" (Casey, 39 NY3d at 1107, quoting Regina, 35 NY3d at 356). Unlike Casey, the present appeal concerns amply supported allegations of fraudulent deregulation, as discussed more fully below. Casey's holding is therefore of little service here, especially as to those apartments deregulated after Roberts.
The majority, however, relies on Casey's statement that "[f]or purposes of calculating overcharges, where it is possible to determine the rent 'actually charged on the base date' . . . that amount should be used and rent increases legally available to defendants pursuant to the [RSL] during the four-year period should be added" (39 NY3d at 1107, quoting Regina, 35 NY3d at 355-356). The majority thus appears to suggest that among the relevant considerations in determining whether to apply the default formula is whether "the amount paid on the base date is known." This proposition is not supported by Casey.
In discussing a fraudulent deregulation's effect on the reliability of the base date rent, the Court of Appeals has repeatedly indicated that, once a court finds that fraudulent deregulation has occurred, it can infer that the base date rent amount is inherently unreliable (see Regina, 35 NY3d at 354-355; Conason, 25 NY3d at 18; Grimm, 15 NY3d at 367; Thornton, 5 NY3d at 181). In fact, both Conason and Thornton held that the default formula properly applied notwithstanding that the amount of rent paid on the base date was not in dispute (see Conason, 25 NY3d at 6-9; Thornton, 5 NY3d at 181; Thornton v Baron,2002 WL 34452911 [Sup Ct, NY County 2002] [complaint amended to include landlord as defendant in November 2000, and rent was $3,750 in 1996, the year of the base date]).
Accordingly, if plaintiffs can establish fraudulent deregulation, even a known base date rent should be considered at least presumptively unreliable.
It is important to note the stark differences between the facts of Casey and those in the case at bar. In this case:
(1) the landlord received J-51 benefits in connection with the subject building from 2005 through 2019.
(2) in 2016, defendant Paul Bogoni, an officer and principal of defendant B-U Realty, admitted in sworn deposition testimony in another case involving a tenant in the same building that he was "very familiar with leasing and rent stabilization and the DHCR"; he is a member of the Rent Stabilization Association (RSA) and receives the RSA's monthly newsletter which he usually reads; that either the RSA [*16]or DHCR notified him of the consequences of the Roberts decision; and that he understood his obligation to treat all tenants as rent stabilized during the time he was receiving J-51 benefits from reading the RSA newsletter about the decision in Roberts, which he recalled was as early as 2009, and "by 2011 for sure" (see also Pascaud v B-U Realty, NY Slip Op 31482U at *4 [Sup Ct, NY County 2017][finding that Mr. Bogoni had admitted that, "at least by 2009 or at the latest, by 2011, he was aware that the Building was subject to rent stabilization"]);[FN4]
(3) on or about July 14, 2014, Assemblymember Daniel O'Donnell wrote to the Bureau Chief of the Tenant Protection Unit of the Division of Housing and Community Renewal (DHCR) about concerns raised by a tenant in the building that the landlord was harassing and discriminating against rent stabilized tenants and unlawfully deregulating rent stabilized apartments despite the landlord's receipt of J-51 benefits;[FN5]
(4) on or about August 14, 2014, DHCR directed the landlord to register eight identified units (including three rented to plaintiffs-appellants in this case, 8A, 9D, and 10D) "immediately," and to "provide rent stabilized leases to every tenant residing in your building as well as notice to those tenants indicating that their apartment is rent stabilized";
(5) on or about September 17, 2014, Assemblymember O'Donnell sent a letter to the building's tenants advising them that they were entitled to the protections of the RSL and notifying them that DHCR had investigated and issued directives to the landlord;
(6) despite Mr. Bogoni's admission of his knowledge of his obligations by 2009 or 2011, and in violation of the DHCR's August 2014 directive, the landlord continued to offer non-rent-stabilized leases to tenants between 2009 and 2019, and had not, as of the date of the motion in this case, ever offered a rent-stabilized lease or renewal on the statutorily required forms to most of plaintiffs-appellants;
(7) despite Mr. Bogoni's admission of his knowledge of his obligations by 2009 or 2011, and in violation of the DHCR's August 2014 directive, the landlord failed to register apartments that had been improperly treated as deregulated until October 27, 2014 and, in some cases, as late as June 16, 2017; and
(8) despite Mr. Bogoni's admission of his awareness of the 2009 Roberts decision's prohibition of deregulation of rent-stabilized apartments while receiving J-51 benefits, the landlord deregulated Apartments 10D (Kane/Perera-Riveroll) in 2010, 9D (Barish-Straus) in 2012, and 8A (the Menapaces) in 2013.
The only conduct by the landlord that the majority acknowledges could be evidence of fraud is the landlord's filing of amended registrations, and it concludes that this fact "does not support fraud as a matter of law," citing Casey. While a single instance of a landlord's filing of amended registrations does not establish a prima facie showing of fraud (see Casey, 39 NY3d 1104), there is [*17]much more than that here.
In my view, the record in this appeal and cross-appeal, including the landlord's acts and failures to act described above, certainly establishes that there are sufficient indicia of fraud that Supreme Court could properly consider rental history preceding the base date to determine whether the landlord engaged in fraud. In fact, under Grimm, I would find that the factfinder has an obligation to do so (15 NY3d at 366). I would find that all of plaintiffs-appellants demonstrated sufficient indicia of fraud for the motion court to have appropriately reviewed rent history preceding the lookback period as to their apartments.
Although the majority's assertion that "plaintiffs have not provided any evidence demonstrating that the defendants' inaccurate amended registrations. . . 'somehow affected the reliability of the actual rent. . . plaintiffs paid on the base date'" (emphasis added) is accurate, this fact is irrelevant if plaintiffs are successful in demonstrating fraud at trial. I would find, moreover, and for the reasons discussed further below, that the record establishes that there are questions of fact as to whether the landlord has engaged in a fraudulent scheme requiring application of the default formula.
B
I disagree with the majority that recent case law requires a tenant seeking application of the default formula based on an alleged fraudulent scheme to prove each element of common-law fraud (Regina, 35 NY3d at 356 n 7; see also Woodson v Convent 1 LLC, 216 AD3d 585, 588 [1st Dept 2023]; Burrows v 75-25 153rd St. LLC, 215 AD3d 105, 109 [1st Dept 2023]).[FN6] The main basis for this interpretation of Regina is footnote seven (35 NY3d at 356 n 7), which stated as follows in full:
"Fraud consists of 'evidence [of] a representation of material fact, falsity, scienter, reliance and injury' (Vermeer Owners v Guterman, 78 NY2d 1114, 1116 [1991]; see e.g. Ambac Assur. Corp. v Countrywide Home Loans, Inc., 31 NY3d 569 [2018]; Pasternack v Laboratory Corp. of Am. Holdings, 27 NY3d 817, 827 [2016]). In this context, willfulness means 'consciously and knowingly charg[ing] . . . improper rent' (Matter of Lavanant v State Div. of Hous. & Community Renewal, 148 AD2d 185, 190 [1st Dept 1989]; see Matter of Old Republic Life Ins. Co. v Thacher, 12 NY2d 48, 56 [1962] [interpreting "willful" in a regulatory context to mean "intentional and deliberate"])."
A close examination of Regina in the context of prior Court of Appeals' case law engaging with this issueshows that we must reject this interpretation and hold that footnote seven is not dispositive of what a tenant is required to demonstrate in support of a claim that a landlord has engaged in a fraudulent scheme to deregulate an apartment.
As discussed above, the Court of Appeals stated the question presented in Regina as: "what is the proper method for calculating the recoverable rent overcharge for New York City apartments that were improperly removed from rent stabilization [*18]during receipt of J-51 benefits prior to [the] 2009 decision in Roberts" (Regina,35 NY3d at 348, citing Roberts, 13 NY3d at 270). In deciding the four appeals [FN7] before it, the Regina Court ultimately held that none of the landlords had engaged in a fraudulent scheme to deregulate the apartments, since "the owners removed apartments from stabilization consistent with agency guidance," and the deregulations were "not based on a fraudulent misstatement of fact but on a misinterpretation of the law — significantly, one that DHCR itself adopted and included in its regulations" (id. at 356).
Moreover, and as noted, in its review of the applicable law, the Regina Court reaffirmed its holdings in Thornton (5 NY3d 175), Grimm (15 NY3d 358), and Conason (25 NY3d 1) (see Regina, 35 NY3d at 355-356). In both Conason and Thornton, the Court of Appeals held that fraud had been established and thus resort to the default formula was merited (Conason, 25 NY3d at 18; Thornton, 5 NY3d at 181). In Grimm, the Court held that "there existed substantial indicia of fraud on the record" such that DHCR had "an obligation to ascertain whether the rent on the base date [wa]s a lawful rent" (Grimm, 15 NY3d at 366).
Because the body of Regina reaffirmed the Court of Appeals' holdings as to the effect of showings of fraud in Thornton, Grimm, and Conason, and recent decisions from this Court have cited a footnote in Regina for its ostensible articulation of a tenant's burden in establishing that a landlord has engaged in a fraudulent deregulation,[FN8] it is instructive to compare the facts of Thornton, Grimm, and Conason to determine whether those cases are consistent with the purported rule. Of particular significance is the element of reliance, which at least one decision suggests should be examined strictly with respect to the tenant or their predecessors (see e.g. Burrows, 215 AD3d at 109 [as a matter of law, neither the plaintiffs nor any of their predecessors could have reasonably relied on the inflated legal regulated rent figures that appeared on the registration statements]).
The Court of Appeals has summarized its Thornton decision as follows:
"[I]n Thornton (5 NY3d 175 [2005]), [] we held that a lease provision purporting to exempt an apartment from the Rent Stabilization Law in exchange for an agreement not to use the apartment as a primary residence was void as against public policy (see id. at 179-180). Our ruling was made in connection with a scheme between a landlord and an illusory tenant to agree that an apartment would not be used as the named tenant's primary residence, resulting in the elimination of the rent-stabilized status of the apartment. Acknowledging that the apartment's prior rental history could not be examined, and that the stabilized rent before the fraudulent scheme was of no relevance, we nonetheless rejected the owner's contention that "the legal regulated rent should be established by simple reference to the rental history" on the date four [*19]years prior to the commencement of the overcharge action (id. at 180-181). We explained that the lease was "void at its inception" because its "circumvent[ion of] the Rent Stabilization Law" violated public policy (id. at 181). As a result, the rent registration statement in effect on the base date "listing this illegal rent was also a nullity" (id.). Rather than using the registration statement to ascertain the rent on the base date, we instructed DHCR to use the so-called default formula to calculate the rent on the base date, as it does when no reliable records are available (see id.; see also Levinson v 390 W. End Assoc., LLC., 22 AD3d 397, 400-401 [1st Dept 2005])."
(Grimm,15 NY3d at 365-366). As relevant here, the Thornton Court also held that application of the default formula was appropriate even though theplaintiffs-subtenants "had unclean hands" (Thornton, 5 NY3d at 181) because they had "made false written statements" indicating that the apartment was not their primary residence (id. at 179). The Court reasoned that "the principle [] establish[ed] here will apply equally to innocent renters looking to succeed illusory tenancies," and a "contrary rule would bring about the rapid removal of many apartments from rent stabilization—at least six such illusory leases have come to light in the [building at issue] alone—undermining the statute's very purpose of preserving a stock of affordable housing" (id. at 181-182). Although the Thornton opinion does not discuss whether the plaintiffs-subtenants relied on any material misrepresentations of the landlord or sublessor, the decision indicates that the plaintiffs were at least to some degree participants in the scheme. Moreover, the motion court's decision suggests that there was no dispute as to the amount of rent paid by the plaintiffs-subtenants on the base date (see Thornton v Baron,2002 WL 34452911 [complaint amended to include landlord as defendant in November 2000, and rent was $3,750 in 1996, the year of the base date]).
The facts of Grimm were recounted in Conason (25 NY3d at 15) as follows:
"The apartment in Grimm was registered as rent-stabilized in 1999 at a legal regulated rent of $578.86. In 2000, the landlord increased the rent to $2,000 per month, but informed the incoming tenants that if they agreed to make certain repairs and improvements, the monthly rent would be reduced to $1,450; they agreed to this arrangement. When Grimm moved into the apartment in 2004, she also paid rent of $1,450 per month. In April 2005, she entered into a renewal lease at a monthly rent of $1,500.75. Grimm subsequently filed a rent overcharge complaint with DHCR in July 2005; she complained that the "owner is fraudulently renting [the] apartment as a non-rent stabilized unit and raised [the] rent illegally in 2005. [The] [i]nitial 2004 rent is also illegal." When DHCR denied Grimm's complaint because the rent adjustments after the base date (July 2001) were lawful, she brought a CPLR article [*20]78 proceeding to challenge the agency's determination."
As noted, the Grimm Court held that "there existed substantial indicia of fraud on the record" such that DHCR had "an obligation to ascertain whether the rent on the base date [wa]s a lawful rent" (Grimm, 15 NY3d at 366). The Court further observed that the "base date rent may not be used as a basis for calculating subsequent regulated rent if fraud is indeed present" (id. at 362). Significantly, the plaintiff-tenant was not the tenant who had performed, or from whom the landlord had sought, repairs and improvements (see Matter of Grimm v State, Div. of Hous. & Community Renewal, Off. of Rent Admin., 68 AD3d 29, 30 [1st Dept 2009], affd 15 NY3d 358), and the Court did not discuss or mention the plaintiff's reliance.[FN9] As with Thornton, there was no dispute in Grimm as to the amount of rent charged and paid on the base date (15 NY3d at 363; see 68 AD3d at 31).
Finally, in Conason, the landlord simply "created a fictitious tenant and fictitious renovation to justify a rent increase" (Regina, 35 NY3d at 355, citing Conason, 25 NY3d at 9). The plaintiffs-tenants "signed a two-year lease" in October 2003, for a term "beginning on November 1, 2003, at a monthly rent of $1,800," and "the lease indicated that the legal regulated rent for the apartment was $2,000 per month, reduced to $1,800" (Conason, 25 NY3d at 6). This Court's decision (Conason v Megan Holding, LLC,109 AD3d 724, 724 [1st Dept 2013], mod 25 NY3d 1) provides further factual context:
"In December 2003, after plaintiffs had commenced occupancy, Megan registered the apartment with [DHCR]. The registration showed that the monthly rent for the [fictitious] previous tenant, Oki Suzuki, was $1,000 per month, and the monthly rent paid by the tenant preceding Suzuki was $475.24."
The Court of Appeals held that the record demonstrated "fraud sufficient to taint the reliability of the rent on the [April 9, 2005] base date" and that application of the default formula was thus proper (Conason, 25 NY3d at 18). Critically, the fraud at issue—the fictitious content of the December 2003 retroactive filing and its implication for the reliability of the plaintiff's initial rent—occurred subsequent to the plaintiffs' commencement of the tenancy; the sequence of events therefore precluded plaintiffs from having relied on the relevant fraud before signing their lease. Like Thornton and Grimm, the Conason Court makes no mention of reliance, and the amount of rent paid on the base date was not in dispute (see 25 NY3d at 6-9).
The Regina Court, as noted, reaffirmed Thornton, Grimm, and Conason with respect to their holdings on the issue of fraud and, as to Thornton and Conason, application of the default formula (35 NY3d at 354-355). The Court further summarized the applicable law:
"The rule that emerges from our precedent is that, under the prior law, review of rental history outside the four-year lookback period was permitted only in the limited category [*21]of cases where the tenant produced evidence of a fraudulent scheme to deregulate and, even then, solely to ascertain whether fraud occurred — not to furnish evidence for calculation of the base date rent or permit recovery for years of overcharges barred by the statute of limitations (Grimm, 15 NY3d at 367). In fraud cases, this Court sanctioned use of the default formula to set the base date rent. Otherwise, for overcharge calculation purposes, the base date rent was the rent actually charged on the base date (four years prior to initiation of the claim) and overcharges were to be calculated by adding the rent increases legally available to the owner under the RSL during the four-year recovery period. Tenants were therefore entitled to damages reflecting only the increases collected during that period that exceeded legal limits." (id. at 355-356 [emphasis added].)
The Court thus framed the issue in Regina: were Roberts deregulations (1) "fraud cases" subject to the default formula or (2) "otherwise," i.e. nonfraud cases subject to ordinary overcharge calculation? Regina then analyzed the Roberts deregulations presented, with particular focus on the nature of a landlord's conduct in following DHCR guidance:
"In the wake of Roberts, courts and DHCR grappled with a surge of claims filed by tenants alleging overcharges arising from the improper deregulation of their apartments years (in some cases more than a decade) before — claims like those now before this Court. For example, the plaintiffs in Raden, who took occupancy of their apartment in 1995 at a market rent, commenced this action in 2010 seeking recovery of overcharges based on a reconstruction of the rent they should have been charged had the apartment never been deregulated. Likewise, in Taylor, similar relief was sought in an overcharge claim filed in 2014 brought by a tenant who took occupancy in 2000. In stark contrast to Thornton, Grimm and Conason, in which tenants came forward with evidence of fraud [footnote seven], in these Roberts cases, the owners removed apartments from stabilization consistent with agency guidance. Deregulation of the apartments during receipt of J-51 benefits was not based on a fraudulent misstatement of fact but on a misinterpretation of the law — significantly, one that DHCR itself adopted and included in its regulations. As we observed in Borden v. 400 E. 55th St. Assoc., L.P., a finding of willfulness "is generally not applicable to cases arising from the aftermath of Roberts" (24 NY3d 382, 389 [2014]). Because conduct cannot be fraudulent without being willful, it follows that the fraud exception to the lookback rule is generally inapplicable to Roberts overcharge claims."
(Regina, 35 NY3d at 356). Footnote seven is placed, as indicated, in the above excerpt and is quoted above.
The case cited in footnote seven for the elements of fraud, Vermeer Owners v Guterman, involved claims under the Martin Act and for common-law fraud based on alleged [*22]misrepresentations in a co-op apartment offering plan (78 NY2d at 1116), where the misrepresentations related to the building's lease of its garage space to an entity formed and owned by the co-op sponsor's principal (see Vermeer Owners, Inc. v Guterman, 169 AD2d 442, 443 [1st Dept 1991], affd 78 NY2d 1114).
There are two possible ways to understand footnote seven. Under one interpretation, adopted by the majority, Regina's footnote seven announced—for Roberts and non-Roberts cases alike—the elements of a fraudulent deregulation claim notwithstanding that the plaintiffs in those cases Regina cited with approval (Thornton, Grimm, and Conason) would not have met at least one of the elements purportedly established—namely, reliance. Alternatively, we can understand that Regina's footnote seven quoted a common-law fraud case for the purpose of illustrating, by way of contrast, the enormous distinction between ordinary notions of fraud and a Roberts deregulation—that is, a deregulation based on (ultimately erroneous) guidance from the very agency tasked with regulating compliance with the body of law at issue.[FN10] In my view, the latter interpretation is better supported by the landscape of precedent.[FN11] However, assuming that the majority is correct that the Court of Appeals meant to use Regina's footnote seven to set forth what a plaintiff-tenant must show to establish a fraudulent deregulation claim, that pronouncement must be squared with the reaffirmed holdings of Thornton, Grimm, and Conason.
The "very purpose" of the system created by the RSL, first enacted in 1969, is to "preserv[e] a stock of affordable housing" (Thornton, 5 NY3d at 182), an issue which continues to be of vital public concern.[FN12] As the Regina Court noted, the relevant inquiry in this context is whether "the owner engaged in a fraudulent scheme to deregulate the apartment" (35 NY3d at 354 [emphasis added]; see Grimm, 15 NY3d at 367 ["fraudulent scheme to destabilize the apartment"]) or fraudulently attempted to increase the rent beyond what is permitted under the RSL (see 435 Cent. Park W. Tenant Assn. v Park Front Apts., LLC, 183 AD3d at 510-511 [default formula applies to fraudulent scheme to overcharge]). In other words, the issue is whether the owner has fraudulently removed or attempted to remove the apartment from lawful coverage, not whether a fraud has been perpetrated on the tenant—although, where established, both may be true (see e.g. Thornton, 5 NY3d at 182 [recognizing that circumvention of the RSL comes "at the expense of the public"]). Pursuant to RSL 26-517, owners of covered buildings are required, as an essential component of the rent regulation system, to register regulated apartments with DHCR annually, setting forth the rent charged on the registration date. Accordingly, the interests of both the public, as represented by DHCR, and a particular tenant are adversely affected by fraudulent deregulation.
Accordingly, plaintiff-tenants should be able to demonstrate [*23]the elements of fraud with reference to themselves, the public as represented by DHCR, or both. Stated differently, it should be no bar that a fraudulent deregulation claim is supported by, for example, landlord misrepresentations in required DHCR filings or DHCR's reliance on the accuracy of the information contained in those filings. If the rule required that fraud be established strictly from the reference point of the tenant, that would place a perverse additional burden on individuals' attempts to merely secure housing, especially in the context of an affordable housing shortage that has been recognized as an emergency (RSL 26-501; see Regina, 35 NY3d at 395-396 [Wilson, J., dissenting])
To the extent Regina's footnote seven set forth the required showing on a claim of fraudulent deregulation, an interpretation permitting a plaintiff-tenant to establish their fraud claim by reference to DHCR is supported not only by the purpose of the RSL but also its capacity to harmonize existing precedent. Otherwise, and as noted, Regina delivered a rule by footnote which contravened holdings simultaneously reaffirmed.[FN13]
III
The specific issues raised requiring trial as to each plaintiff-appellant are discussed in greater detail in this section. The landlord does not deny the basic facts of each plaintiff's tenancy, but claims that "mistakes were made" in reliance on DHCR guidance. Defendants do not explain how they could have continued to rely on that guidance after the Court of Appeals issued its decision in Roberts in 2009, and the landlord's claim is further called into question by defendant Bogoni's sworn testimony that he became aware, at some time between 2009 and 2011, of his obligation to treat all tenants in the building as rent stabilized.
Apartments 2C (2008-2012) and 9D (2012 to present) (Barish-Straus)
I would find that the motion court should have considered Ms. Barish-Straus's overcharge claim as to 2C, as she resided there on the base date (November 18, 2010).[FN14] I would further find, on this record, that there are questions of fact as to whether the landlord engaged in a fraudulent scheme tainting the reliability of 2C's base date rent. I would also find that there is a question of fact as to whether 2C's base date rent can be determined at all ([RSC] 9 NYCRR 2522.6[b][2][[i]), since the landlord did not register a rent until well after the date of commencement.
I would further find that the motion court properly considered Ms. Barish-Straus's overcharge claim as to Apartment 9D, where she moved in 2012 and has resided since. However, contrary to the motion court's finding that there was fraud tainting the base date as a matter of law and the majority's finding to the contrary as a matter of law, I would find that there are issues of fact requiring a trial as to whether the landlord engaged in a fraudulent scheme tainting 9D's base date rent, which would in turn require application of the default formula.
The landlord has never offered [*24]Ms. Barish-Straus a rent-stabilized lease for either 2C or 9D. She states in her affidavit that she moved into Apartment 2C pursuant to a one-year non-rent-stabilized lease commencing April 2008. Despite Mr. Bogoni's admission that he was aware of his obligation to offer all tenants rent-stabilized leases by 2011, the landlord offered Ms. Barish-Straus an additional non-rent-stabilized lease for 2C in 2011. Ms. Barish-Straus states in her affidavit that in 2012 she moved out of Apartment 2C and into Apartment 9D because she could no longer afford to live in 2C, where the rent the landlord charged her was $5,086.94 per month. She later learned that the rent increases were improper, noting her receipt of Assemblymember O'Donnell's September 17, 2014 letter. She further states that, but for the landlord's misrepresentation to her that 2C was not subject to rent stabilization and the concomitant imposition of unlawful rent increases, she would have remained in 2C.
According to the 2017 DHCR registration rent roll report (2017 DHCR rent roll) for the building, which is in the record, Apartment 2C was not registered with DHCR as of the date of commencement, November 18, 2014. In or about January 2015, the landlord filed retroactively amended DHCR registration statements listing Ms. Barish-Straus as a rent-stabilized tenant from 2008 through 2012.[FN15] Accordingly, I would find that the landlord's proffer of non-rent-stabilized leases for 2C and failure to register 2C at all until after commencement, despite defendant Bogoni's testimony in 2016 that he was aware at some time between 2009 and 2011 of his obligation to treat all tenants as rent-stabilized during the J-51 period, raises questions of fact requiring a trial as to whether the landlord engaged in a fraudulent scheme to deny Ms. Barish-Straus her rent stabilization rights as to 2C.
In her affidavit, Ms. Barish-Straus states that she moved into Apartment 9D in 2012 pursuant to a one-year non-rent-stabilized lease. She was offered additional non-rent-stabilized leases in the following years. The August 14, 2014 letter from the DHCR to the landlord specifically listed Apartment 9D as one of the apartments the DHCR had identified as having been improperly deregulated and as to which the landlord was directed to notify the tenant of her rent-stabilized status, register the apartment "immediately," and provide the tenant with a rent-stabilized lease.
According to the 2017 DHCR rent roll, the landlord registered the unit as rent-stabilized through 2011, when the landlord registered it with a rent-stabilized tenant identified as "F Douglas" with a one-year lease from June 1, 2010 through May 31, 2011 at a monthly "legal regulated" rent of $2,594.48. For registration year 2012 (the year Ms. Barish-Straus moved in), the landlord registered 9D as "permanently exempt" due to "high rent vacancy." According to the apartment's amended registration, the landlord still has not registered 9D at all for registration [*25]year 2013, despite having filed annual registrations for the unit in 2014, 2015, 2016 and 2017. On or about October 27, 2014, the landlord finally registered 9D as rent-stabilized, listing Ms. Barish-Straus as the tenant pursuant to a one-year lease commencing April 1, 2014 at a monthly "legal regulated" rent of $3,500. Ms. Barish-Straus is listed as the rent-stabilized tenant for each following registration year through 2017.
I would find that the following facts as to 9D raise questions of fact requiring a trial as to whether the landlord engaged in a fraudulent scheme tainting the registered base date rent, thus requiring application of the default formula: (1) the landlord's purported deregulation of 9D in 2012; (2) its failure to register 9D as rent-stabilized until October 27, 2014, despite Mr. Bogoni's testimony that he knew at least as early as 2009 and no later than 2011 of his obligation to do so; (3) the landlord's registration of 9D as rent stabilized only after the DHCR specifically directed him to do so despite this admission; and (4) the landlord's failure ever to offer Ms. Barish-Straus a rent-stabilized lease.
I note, in connection with 9D and with 8A and 10D (discussed below), each of which was deregulated after 2009, that the Court of Appeals in Regina was addressing the question of the proper method for establishing legal rents and calculating damages for apartments "removed from rent stabilization during receipt of J-51 benefits prior to our 2009 decision in Roberts" (35 NY3d at 348). Accordingly, the Regina Court was expressly not addressing whether courts were foreclosed from considering whether a landlord's removal of apartments from rent regulation after 2009 was part of a fraudulent scheme.
Apartment 8A (the Menapaces):
Like 9D, Apartment 8A was deregulated after Roberts in 2013. I disagree with the majority that we can find on this record, as a matter of law, that the landlord did not commit fraud affecting the base date rent and that the default formula does not apply. Additionally, as noted at the outset, such a finding is procedurally improper in the current posture. I would also find that the motion court erred in finding, as a matter of law, that there was fraud and that the default formula applies. I would remand for a trial of those issues.
According to Ms. Menapace's affidavit, she, her husband, and their two children moved into Apartment 8A pursuant to a non-rent-stabilized lease commencing on October 1, 2013 at a monthly rent of $4,200. They were offered an additional one-year non-rent-stabilized lease in 2014 at a monthly rent of $4,242. The landlord never advised them that their apartment is covered by rent stabilization. They later learned that it was, noting Assemblymember O'Donnell's September 17, 2014 letter.
The DHCR registration documents in the record indicate that 8A was registered as rent-stabilized at a monthly rent of $1,064.29 in registration year 2005, when the landlord began receiving [*26]J-51 benefits. It was not registered at all after that until 2015, when the landlord retroactively registered 8A as rent-stabilized from 2006 through 2013, listing a tenant identified as "Madera M." as the rent-stabilized tenant in the 2013 registration year, pursuant to a lease from February 1, 2012 through January 31, 2014 at a monthly rent of $1,470.08. In January 2017, the landlord filed retroactive registrations listing plaintiffs as the tenants of record for the unit for the years 2014 through 2016.
Defendants admit that they overcharged the Menapaces, but claim this was error. They justify their calculation of the Menapaces' initial rent with allowable increases to the base date rent. However, the amended registration in the record sets forth inaccurate rent amounts—the legal regulated rent for the years 2014 and 2015 are listed as $2,906.64 and $2,935.71, respectively; while, as stated above, the Menapaces paid $4,200 and $4,242 in rent for those same years. Moreover, in the affidavit in opposition to plaintiff's motion and in the attached exhibit of calculations, defendants assert that the legal rent for the subject apartment at the commencement of plaintiffs' tenancy was $3,003.67, and $3,123.82 upon renewal, contrary to both the legal regulated rent reflected on the apartment's amended registration and the rents actually paid by plaintiffs. That defendants now claim an ability to calculate what the Menapaces' rent ought to have been is irrelevant at this posture given the conflicting evidence in the record.
Since the Menapaces moved in after the base date (November 18, 2010), there is no proof in this record of what the tenant who preceded them actually paid on the base date. Given this lack of evidence, the landlord's deregulation of 8A two years after the latest date by which the landlord has admitted he understood that he was not permitted to do so, and the discrepancies between the legal regulated rent (1) listed on the registration, (2) asserted in defendants' affidavit, and (3) actually paid by plaintiffs, I would find that the Menapaces have raised questions of fact requiring a trial as to whether the landlord engaged in a fraudulent scheme requiring application of the default formula. Apartment 10D (Kane/Perera-Riveroll):
Similarly to 9D and 8A, Apartment 10D was deregulated after Roberts in 2010. I disagree with the majority that we can find as a matter of law that the default formula does not apply, and I would also find that the motion court erred in finding that it does. I would remand for a trial on the issue of whether the landlord engaged in a fraudulent scheme requiring application of the default formula.
Mr. Kane, Ms. Perera-Riveroll, and their daughter moved into 10D in November 2009 pursuant to a two-year non-rent-stabilized lease at a monthly rent of $2,800 for the first year and $2,900 for the second year. They entered into three additional one-year non-rent-stabilized leases in 2011 (at $2,987 per month), 2012[*27](at $3,076.61 per month), and 2013 (at $3,199.67 per month). According to Ms. Perera-Riveroll's affidavit, in October 2014, the landlord offered them a lease that mentioned rent stabilization but was not on the statutorily required form, did not offer them a choice to renew for one or two years and did not include a rent-stabilized rider.
According to the apartment's original registration, as of August 11, 2014, 10D was registered as rent-stabilized from 1984 through 2009, with a tenant (Knight) residing in the apartment from 1987 through 2009. In 2010, the apartment was listed as exempt because of "High Rent Vacancy" and continued to be listed as exempt for the years 2011 to 2013. The landlord filed amended registrations in January 2015 listing 10D as rent-stabilized with plaintiffs as the tenants of record for the years 2011, 2012, and 2013. In February 2015, the landlord filed a further amended registration listing 10D as rent-stabilized in 2010 with Kane/Perera-Riveroll as tenants at a monthly rent of $2,800, and the notation "Vac/leas Imprvmnt." The landlord filed annual registrations in August 2015 and July 2016 which continued to list the unit as rent-stabilized with the same tenants for those registration years. Notably, the registrations contain information that directly contradicts Bogoni's affidavit in opposition to the motion. First, both the original and amended registrations list the legal regulated rent for the tenant immediately preceding plaintiffs' tenancy as $1,828.55; defendants assert in their affidavit that the legal regulated rent for this tenant was $2,321.11, which was over the deregulation threshold at the time. Additionally, both registrations list "Knight" as the tenant of record prior to plaintiffs' tenancy; however, defendants' affidavit states that "Jonathan Rosen" was the prior tenant. Furthermore, Bogoni contends that defendant was entitled to a 17% vacancy increase at the time plaintiffs moved into the subject apartment, resulting in an amount, that, by defendants' own calculations, was less than the legal regulated rent listed in the apartment's amended registration for 2010.
In view of Mr. Bogoni's sworn testimony that he was aware of the 2009 Roberts decision, the landlord's improper purported deregulation of 10D in 2010, the DHCR's August 2014 directive, the inconsistencies between the information reflected in the amended registrations and the assertions put forth in Bogoni's affidavit, the landlord's failure ever to offer these tenants a rent-stabilized lease or renewals on the statutorily required forms, and failure to even register 10D as rent-stabilized until 2015, I would find there are issues of fact requiring a trial as to whether the landlord engaged in fraud requiring application of the default formula. Apartment 11B (Aras)
I disagree with the majority that we can find that the default formula does not apply to Ms. Aras's overcharge claim, and I also disagree with the motion court's finding that [*28]it does. I would remand for a trial on the issue of whether the landlord engaged in a fraudulent scheme requiring application of the default formula.
According to Ms. Aras's affidavit, she moved into 11B in February 2012 pursuant to a one-year non-rent-stabilized lease at a monthly rent of $4,950. The landlord offered and she signed additional non-rent-stabilized leases in February 2013 and February 2014. The landlord required her to pay rent in two checks, one to Mr. Bogoni and one to B-U Realty. In February 2015, the landlord offered her back-dated rent-stabilized leases covering the full period of her tenancy but she refused to sign them.
According to the registration documents in the record, Apartment 11B was registered as "permanently exempt" in 1997 due to "substantial rehabilitation . . . vac/leas imprvmnt." In 1998, it was again listed as "permanently exempt" due to "high rent vacancy." The DHCR registration as of May 1, 2014 listed the apartment as exempt through registration year 2013. In January 2015, the landlord filed an amended registration which listed the apartment in registration year 2005 (when J-51 benefits began) as "permanently exempt" due to "high rent vacancy," vacant for registration year 2006 but with a "legal regulated rent" of $4,100, and with various "rent stabilized" tenants for registration years 2007 through 2011 at rents from $4,795 to $5,095. It lists Ms. Aras as a "rent stabilized" tenant beginning in registration year 2012, and each subsequent year through registration year 2017 with monthly "legal regulated" rents from $4,950 to $5,250.96.
I would find that there are questions of fact requiring a trial as to whether the landlord engaged in fraud requiring application of the default formula based on the following facts: (1) Mr. Bogoni's testimony that he knew of his obligations while receiving J-51 benefits as of 2009 or 2011 at the latest; (2) the landlord's failure to register 11B as rent-stabilized until 2014 and to offer Ms. Aras rent-stabilized leases until 2015, after the DHCR's August 2014 directive and after commencement; and (3) the landlord's request that Ms. Aras sign back-dated rent-stabilized leases and pay rent in two payments to two different recipients.
Apartment 8D (Lederer)
I disagree with the majority that we can find that the default formula does not apply to Ms. Lederer's overcharge claim. I would reverse the motion court's finding that it does as a matter of law, and would remand for a trial on the issue of whether the landlord engaged in a fraudulent scheme requiring application of the default formula.
Ms. Lederer states in her affidavit that she and her son moved in August 2010 pursuant to a one-year non-rent-stabilized lease at a monthly rent of $3,095. She was offered additional one-year non-rent-stabilized leases in 2011 (at $3,195 per month), 2012 (at $3,295 per month), 2013 (at $3,375 per month), and 2014 (at $3,510 per month). There is no dispute that she paid these rents during [*29]these periods.
According to the DHCR registration documents in the record, Apartment 8D was deregulated in 2004, before the landlord began receiving J-51 benefits. The landlord did not register 8D at all after 2004 until October 27, 2014, when it registered 8D as rent stabilized with Ms. Lederer as the tenant pursuant to a lease from August 31, 2013 through July 31, 2014. Despite Mr. Bogoni's admission that he was aware of his obligations at the latest by 2011, and despite the landlord's retroactive registration of other units between 2014 and 2017, the landlord has never retroactively registered 8D as rent-stabilized for any of the prior years in which the building participated in the J-51 program, including 2010 when Ms. Lederer's tenancy commenced.
Based on these facts, I would find that there is a question of fact as to whether the landlord engaged in a fraudulent scheme that denied Ms. Lederer the protections of the RSL requiring application of the default formula.
Apartment 11C (Arnot/Hirsch):
I disagree with the motion court and with the majority that we may find that the landlord did not engage in a fraudulent scheme with regard to Apartment 11C; that tenants Arnot and Hirsch, who moved in in August 2013, were the first tenants to occupy Apartment 11C after the last rent controlled tenant moved out; that their sole remedy was to file a fair market rent appeal (FMRA) within four years of commencement of their tenancy pursuant to 9 NYCRR 2522.3; and that, because they failed to do so, their request for summary judgment on their overcharge claim should be denied. I would find that there are questions of fact as to whether the landlord committed fraud such that the default formula should be applied.
Mr. Arnot and Ms. Hirsch moved into 11C pursuant to a one-year non-rent-stabilized lease commencing on August 1, 2013 at a monthly rent of $6,000. They entered into an additional one-year non-rent-stabilized lease commencing on August 1, 2014 at a monthly rent of $6,240. In 2019, the landlord offered them a two-year non-rent-stabilized lease commencing on March 1, 2019 at a monthly rent of $6,000. Mr. Arnot's affidavit states that the landlord never advised him or Ms. Hirsch that 11C was covered by rent stabilization. They moved out in February 2020 because they could not afford the rent, "despite [their] strong preference to remain in [their] home of many years."
According to the DHCR registration information for apartment 11C as of October 28, 2014, the landlord first registered the unit in 1984 as rent-controlled. For each year through 2013, 11C was registered as "Rent Control-Reg not required." In October 2014, the landlord registered the apartment as rent-stabilized with Hirsch as the tenant, with a monthly rent of $6,000 under a lease term from April 1, 2014 to March 31, 2015; this is not consistent with the lease actually entered into, which was from August 1, 2014 through July 31, 2015 and lists a monthly rent of $6,240. The 2017 DHCR [*30]rent roll lists the correct lease term with a rent of $6,240. There is no monthly rent registered for the base date in either the apartment's registration or the 2017 DHCR rent roll for the building.
As plaintiffs point out, the landlord also filed sworn maximum base rent (MBR) statements, which list all rent controlled apartments in the building from 2002 through 2013. Apartment 11C is only listed on the MBR schedules from 2002 through 2005. Accordingly, if new tenants moved into 11C after the last rent controlled tenancy is listed in 2005 and before Arnot and Hirsch moved in in 2013, the landlord should have registered a rent-stabilized base date rent, since he admitted he was aware of his obligation to treat all tenants in the building as rent-stabilized by 2011 at the latest and he filed the annual registration for 11C in 2014 and an amended registration for 11C in 2015.
While I agree with the majority that the sworn MBR statements, standing alone, do not establish as a matter of law that the landlord engaged in fraud, they strongly suggest that there was another tenant preceding Arnot and Hirsch to whom the FMRA time limitations would have applied and whose tenancy should have been treated as rent stabilized. The alternative explanation is that 11C sat empty after the last rent-controlled tenant vacated in 2005 until Arnot and Hirsch moved in in 2013. This would be a highly unlikely circumstance which the landlord has neither claimed nor explained. Furthermore, the fact that the landlord failed to provide Arnot and Hirsch with rent-stabilized leases and renewals in the years 2013 through 2019, many years after the landlord was admittedly aware of his obligation to do so, also raises a question of fact as to whether the landlord engaged in a fraudulent scheme. Accordingly, I would deny summary judgment as to Arnot and Hirsch's overcharge claim, and remand for a trial on the issue of whether the landlord engaged in a fraudulent scheme requiring application of the default formula. Apartment 1B (Panozzo/Marantos):
Like 11c, Apartment 1B was registered as rent-controlled before plaintiffs moved in. However, I disagree with the motion court that that Panozzo and Marantos have established fraud as a matter of law. At the same time, since the landlord did not cross-move for summary judgment on the issue of the application of the default formula, I disagree with the majority's determination that the default formula applies and I would remand for trial on that issue.
Mr. Panozzo, Ms. Marantos, and their children moved into Apartment 1B pursuant to a one-year non-rent-stabilized lease commencing May 28, 2011 at a monthly rent of $4,695. They entered into additional one-year non-rent-stabilized leases in 2012, 2013, and 2014.
The MBR schedules list 1B as rent-controlled through 2010. The landlord failed to register 1B as rent-stabilized until 2014, when it registered the apartment for that year alone. Then, in January 2015, the landlord retroactively [*31]registered the apartment as rent-stabilized for the years 2012 and 2013. As of the 2017 registration, it is registered as rent-stabilized with Mr. Panozzo as the tenant for the years 2011 through 2016. Since there is nothing in this record that demonstrates as to 1B the kinds of discrepancies apparent between the DHCR registrations and the MBR schedules described above regarding Apartment 11C, it appears that these plaintiffs were the first tenants to occupy Apartment 1B after the last rent-controlled tenant moved out in 2010. Accordingly, it appears that the fair market rent agreed to at the commencement of their tenancy is the initial regulated rent for their rent-stabilized tenancy (RSL 26-512[b][2]). If so, their deadline to challenge the rent amount in a FMRA would have expired in May 2015. However, since the landlord did not move for summary judgment on this issue, this Court may not grant affirmative relief to him. Should Mr. Panozzo and Ms. Marantos fail to prove otherwise at trial, their overcharge damages would be limited to any increase in rent that was not in accordance with RGB guidelines. If they prove that they were overcharged and the landlord fails to prove by a preponderance of the evidence that such overcharge was not willful, they will be entitled to treble damages (RSL 26-516; 9 NYCRR 2526.1[a][3][i]).
10B (Gladstone/Campana):
I agree with the motion court and with the majority that defendants were entitled to charge a market rent when Gladstone and Campana entered their initial lease in 2003, before the J-51 period began, because the apartment had been deregulated in 1998. This fact also leads to the conclusion that this is not a classic Roberts scenario, since Roberts dealt only with landlords who deregulated apartments while receiving J-51 benefits and relying on DHCR guidance that it was appropriate to do so where an apartment was subject to rent stabilization "solely" as a consequence of the landlord's receipt of J-51 benefits. Roberts did not deal with situations where the landlord failed to return a previously deregulated unit to rent stabilization during the J-51 period. While there are indicia of fraud present (including the landlord's failure to register 10B until 2015, after Gladstone and Campana had moved out on March 31, 2014; failure to offer them rent stabilized leases from 2011 through 2014; and continuing to offer a non-rent-stabilized lease to the tenant who occupied the apartment after they left), these tenants have not established on this record that these activities constituted fraud requiring the application of the default formula. In particular, there is no dispute that Gladstone and Campana paid the rents listed in the amended DHCR registration. Accordingly, the motion court properly declined to grant summary judgment on Gladstone and Campana's request that the default formula be applied to determine their rent overcharge claim. However, it should not have determined that the default formula does not [*32]apply as a matter of law, since the landlord failed to seek this relief. I also disagree with the majority's affirmance of this determination, for the same reasons. I would affirm the denial of summary judgment and remand for trial. I would find that, should these tenants fail to establish at trial fraud requiring the application of the default formula, their overcharge claim is limited to any increases in their rent from November 18, 2010 to the date they moved out on March 31, 2014 that exceeded permissible increases. If they prove that they were overcharged and the landlord fails to prove by a preponderance of the evidence that the overcharge was not willful, they would be entitled to treble damages (RSL 26-516; 9 NYCRR 2526.1[a][1]).
Finally, as to the argument by plaintiffs-appellants Aras (11B), Kane/Perera-Riveroll (10D) and Barish-Straus (as to 9D) to modify purported errors in the motion court's determination of the appropriate "comparable apartments" in applying the default formula, I would find that those arguments may be raised before the court in determining plaintiffs' respective damages on the first cause of action, should they prevail at trial on the issue of whether the default formula applies (see e.g. 197 AD3d at 406).
Order, Supreme Court, New York County (James D' Auguste, J.) entered on or about September 9, 2021, modified, on the law, to clarify that the base date for all plaintiffs is November 18, 2010, to deny the motion as set forth herein as to plaintiffs Gladstone and Campana and Panozzo and Marantos, and the matter remanded for a determination on damages, to be calculated pursuant to RSL 26-516 and RSC 2526.1(a)(3)(i), and otherwise affirmed, without costs.
Opinion by Kennedy, J. All concur except Gesmer and Rodriguez, JJ. Who dissent in an Opinion by Gesmer, J.
Kern, J.P., Gesmer, Kennedy, Scarpulla, Rodriguez, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: October 3, 2023

Footnotes

Footnote 1:Bogoni testified that he was aware that Roberts was decided, but maintained that he was not aware of the implications of the decision until later, when his attorneys explained the decision, at which point he made the appropriate back payments to tenants and filed amended registrations. Bogoni also testified that his office was responsible for filing the rent registrations and that his management company was also responsible for issuing leases.
Footnote 2: Notably, this letter was not sent to defendants.

Footnote 3:The Regina Court held that the HSTPA, which amended the relevant statutory framework in rent overcharge cases, does not apply retroactively.
Footnote 1: The majority misstates the issue in this case as being "whether the record before us sets forth evidence of a fraudulent scheme ." Rather, the issue is whether plaintiffs have established that there is no question of fact as to whether defendants engaged in a fraudulent scheme. I agree with the majority that plaintiffs did not meet their burden on that issue. By going on to determine that the record establishes that defendants did not engage in a fraudulent scheme, the majority is deciding an issue which is not before us on plaintiffs' motion for summary judgment.
Footnote 2: I agree with the majority that the base date for all plaintiffs is November 18, 2010, four years before commencement.

Footnote 3: The four-year lookback rule, the rent charged on the base date, and the four-year statute of limitations are only relevant when rent overcharge is alleged during periods prior to the HSTPA's enactment in 2019, because HSTPA:

"extended the four-year limitations period for overcharge claims to six years, provided that an overcharge complaint 'may be filed . . . at any time' and eliminated the provision—present, in substance, since 1983—stating that 'no determination of an overcharge and no award or calculation of an award of the amount of an overcharge may be based upon an overcharge having occurred more than four years before the complaint is filed' (RSL 26-516 [a] [2]; see CPLR 213-a). It also entirely abolished the lookback rule in favor of new requirements: the base date rent is no longer defined as the rent charged or reflected in a registration statement on the base date but that reflected in the 'most recent reliable' registration statement filed six 'or more' years before the most recent registration (RSL 26-516 [a] [i]). Examination of rent history that predates the period covered by the former lookback rule is no longer precluded. Instead, DHCR and courts are now required to 'consider all available rent history which is reasonably necessary' to investigate overcharge claims and determine legal regulated rent, regardless of the vintage of that history and including records kept by owners, tenants and agencies" (Regina, 35 NY3d at 363-364).

Footnote 4: I disagree with the majority's characterization of Bogoni's testimony. In any event, given the finding by the motion court in Pascaud, from which defendants have not appealed, that determination is res judicata as to them (see Rojas v Romanoff, 186 AD3d 103, 108-109 [1st Dept 2020]) and is unaffected by subsequent decisional law.

Footnote 5: Notwithstanding the majority's suggestion that the Assemblymember's correspondence is irrelevant, the briefs make clear that the correspondence is included in the record to explain (1) the impetus for DHCR's August 2014 direction to the landlord, which followed the July 2014 letter, and (2) the context of some of the tenants' actions.

Footnote 6: As discussed infra (in footnote 13), defendants have argued only that plaintiffs failed to demonstrate that the alleged overcharges and deregulations were willful, thus implicating only the scienter element of common-law fraud. The majority, however, anchors its analysis on the view that the tenants must prove "[a]ll [the] elements of fraud ." (see majority at 8 ["plaintiffs were required to prove, prima facie, the elements of fraud. However, they neither pleaded the necessary elements nor, to the extent pleaded, adequately proved them"]). This issue is thus ripe for discussion. In any event, the lack of clarity with regard to the appropriate contours of this claim has a plainly deleterious impact on rent-regulated tenants and landlords alike, and resolution is appropriate on the well-developed record presented by this appeal.

Footnote 7: The Court in Regina decided appeals from four Appellate Division decisions (Reich v Belnord Partners, LLC, 168 AD3d 482 [1st Dept 2019]; Raden v 7879 LLC, 164 AD3d 440 [1st Dept 2018]; Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 164 AD3d 420 [1st Dept 2018]; Taylor v 72A Realty Assoc., L.P., 151 AD3d 95 [1st Dept 2017]), each of which "involve[d] an apartment that was treated as deregulated consistent with then-prevailing DHCR regulations and guidance before this Court rejected that guidance in Roberts" (Regina, 35 NY3d at 350).

Footnote 8: See e.g., Hess v EDR Assets, LLC, 217 AD3d at 543 (quoting or citing Regina'sfootnote seven for the elements of common-law fraud); Quinatoa v Hewlett Assoc., LP, 205 AD3d 654, 655 (1st Dept 2022) (same); Casey v Whitehouse Estates, Inc., 197 AD3d at 405, 408 (same by majority and dissent), revd 39 NY3d 1104 (2023); Montera v KMR Amsterdam LLC, 193 AD3d at 107, 110 (same by majority and dissent); Matter of Kostic v New York State Div. of Hous. & Community Renewal, 188 AD3d 569, 570 (1st Dept 2020) (same); Goldfelder v Cenpark Realty LLC, 187 AD3d 572, 573 (1st Dept 2020) (same), lv denied 37 NYd3 915 (2021).

Footnote 9: Cf. Burrows v 75-25 153rd St. LLC, 215 AD3d at 109 (1st Dept 2023 [as a matter of law, "neither plaintiffs nor their predecessors in interest could have reasonably relied upon the inflated legal regulated rents on the registration statements"] [emphasis added]).

Footnote 10: Notably, the four appeals decided in Regina involved Roberts deregulations alone as the central bases for the asserted fraudulent deregulation claims (see Reich v Belnord Partners, LLC, 168 AD3d 482; Raden v 7879 LLC, 164 AD3d 440; Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 164 AD3d 420; Taylor v 72A Realty Assoc., L.P., 151 AD3d 95; see also Regina, 35 NY3d at 356).

Footnote 11: Of further note, in the Appellate Division decision reversed in Casey (Casey v Whitehouse Estates, Inc., 197 AD3d 401, revd 39 NY3d 1104)both the majority (id. at 405) and dissent (id. at 408) cited Regina's footnote seven for the elements of the claim. Although the Court of Appeals, in reversing, quoted the Appellate Division dissent (Casey, 39 NY3d at 1107), it conspicuously omitted any citation or discussion to or regarding Regina's footnote seven (see id.).

Footnote 12: Although not implicated here, the Legislature's enactment in 2019 of the Housing Stability and Tenant Protection Act demonstrates, if nothing else, that the severe shortage of affordable housing continues (see Regina, 35 NY3d 332, 383).

Footnote 13: Even if the tenants were required to prove each element of fraud as between the landlord and themselves, the landlord has argued only that plaintiffs have failed to demonstrate scienter. I would find that the plaintiffs-appellants have, at a minimum, raised questions of fact requiring a trial as to scienter, given defendant Bogoni's deposition testimony in Pascaud.
Defendants do not dispute that plaintiffs-appellants have made out a prima facie showing of the other elements of common-law fraud and do not rebut those showings except for claiming that any improper acts they made were "mistakes." This claim is only relevant to the element of scienter, and is undermined in any event by defendant Bogoni's testimony. Accordingly, I would find that the landlord's proffer of non-rent-stabilized leases during the J-51 period constitutes the representation of a material fact which is false; the tenants' sworn statements that they entered into non-rent-stabilized leases and only learned later that their apartments were subject to rent stabilization fulfills the reliance requirement; and the landlord's denial to tenants of the protections of rent stabilization, including failing to provide them with rent stabilized leases on the statutorily required forms, and subjecting them to rent overcharges resulting from the landlord's acts, constitute injury. I would remand for a trial on the question of scienter and whether the landlord engaged in a fraudulent scheme tainting the base date and requiring application of the default formula (see Hess, 217 AD3d 542).

Footnote 14: The majority argues that the overcharge claim as to Apartment 2C was properly denied because Ms. Barish-Straus did not submit a copy of a lease for that unit. However, there is no dispute that she was the tenant there from 2008-2012.

Footnote 15: According to the 2017 DHCR rent roll, Apartment 2C was registered as "permanently exempt" due to "high rent vacancy" in 1998. The landlord filed retroactive registration statements for 2C in 2015 listing the apartment as "temporarily exempt" due to "comm/prof (no c/o)"; "vacant" for the years 2004 through 2006; rent stabilized with a monthly "legal regulated rent" starting at $4,695 in 2007; and with Ms. Barish-Straus as the rent stabilized tenant for the years 2008 through 2012. The majority argues that there is no evidence that the landlord's deregulation of 2C in 1998 was fraudulent. However, this fact leads to the conclusion that 2C is not a "classic" Roberts deregulation, since Roberts dealt only with landlords who deregulated apartments while receiving J-51 benefits and relying on DHCR guidance that it was appropriate to do so where an apartment was subject to rent stabilization "solely" as a consequence of the landlord's receipt of J-51 benefits. Roberts did not deal with situations where the landlord failed to return a previously deregulated unit to rent stabilization during the J-51 period.